**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SELETA ADAMSON,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **AMERICAN AIRLINES, INC.** | § | **CIVIL ACTION NO. _____** |
| | § | |
| **Defendant.** | § | |
| | § | |
| | § | |

## PLAINTIFF'S COMPLAINT AND JURY DEMAND

Plaintiff Seleta Adamson ("Plaintiff" or "Adamson") files this Complaint against Defendant American Airlines, Inc. ("American"), based on personal knowledge as to Plaintiff's own actions and on information and belief as to all other matters, as follows:

### I.

### PRELIMINARY STATEMENT

1.      Adamson is a 29-year-old African American woman.  Being young, friendly, considerate, smart, hardworking, and ambitious, Adamson had all the traits that American needed when customers went to its ticket counters for assistance.  In September 2014, after first gaining experience with Southwest Airlines, Adamson was eager to join American and enhance her skills working as a customer service agent at the Will Rodgers World Airport in Oklahoma City, Oklahoma ("OKC").

2.      Unfortunately, soon after she joined American, a group of senior Caucasian agents at OKC abused their power and treated Adamson with complete disrespect for no-other reason but for the color of her skin.  After a year and a half of mistreatment, Adamson decided to

transfer out of OKC to San Antonio International Airport in San Antonio, Texas ("SAT").  She was hopeful that the wrongful conduct she was subjected to at OKC was an aberration and that she would have a fresh start at SAT.

3.     A short seven months later, without additional prompting, Adamson received a transfer to American's terminal at Dallas/Fort Worth International Airport ("DFW").  With only a short amount of time to decide, Adamson accepted the transfer, hoping to gain exposure to new opportunities at a larger airport and be closer to family.  However, she was again victimized by unfair treatment and groundless write-ups because of American's increasing demand for workers at DFW.

4.     While employed with American, little did Adamson know that the meaningless and baseless non-performance-related write-ups that she received in OKC and DFW would be the alleged bases of her unwarranted termination.  Sadly, Adamson was terminated for adhering to American's policies and procedures when she prevented a customer from boarding a full flight with three carry-on items.

5.     By this suit, Adamson seeks to be compensated for the wrongs she has suffered at the hands of American and to ensure that others do not suffer the same mistreatment.

## II.

## JURISDICTION AND VENUE

6.     Pursuant to 28 U.S.C. § 1331 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, this Court has subject matter jurisdiction over this action.

7.     The Court has personal jurisdiction over Defendant, and venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391(b), because Plaintiff resides within this

judicial district, American Airlines is located in this judicial district, and a substantial portion of the acts that make up the basis of the complaint occurred within this judicial district.

## III.

## PARTIES

### A.    Plaintiff

8.    Adamson is an African American woman who resides at 8985 Vantage Point Drive, Dallas, Texas 75243.

### B.    Defendant

9.    American is a Delaware corporation registered to do business in Texas.  Its principal place of business is located at P. O. Box 619616 MD566, Dallas/Fort Worth Airport, Texas 75261.  American can be served with service of process by and through its registered agent C.T. Corporation, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

## IV.

## FACTS

### A.    American's Claimed Commitment To Diversity and Inclusion

10.    American is the largest commercial airline in the world with approximately 120,000 employees.  American and its subsidiaries offer an average of nearly 6,700 flights per day to nearly 350 destinations in more than 50 countries.  American prides itself on being "committed to providing team members with an inclusive and supportive work environment."[1] American boasts that "inclusion and diversity is a way of life"[2] at American, but that is not the treatment Adamson received as an employee of American.

---

[1]    *See* American Airlines 2016 Corporate Responsibility Report, http://s21.q4cdn.com/616071541/files/doc_downloads/crr/CRR-Report-2016.pdf, last visited March 29, 2018.

[2]    *See* American Airlines, Inclusion and Diversity, https://www.aa.com/i18n/customer-service/about-us/diversity/inclusion-and-diversity.jsp, last visited March 29, 2018.

**PLAINTIFF'S COMPLAINT AND JURY DEMAND**                                        **Page 3**

11.     In 2013, American merged with U.S. Airways in an $11 billion transaction to become the world's largest airline.  It took over two years to complete the merger.  Many changes came along with this merger.  Most importantly, American had to hire and train additional airline personnel to accommodate the increase in customers.  Adamson was one of the new-hires as a result of the merger.

12.     Prior to joining American, Adamson worked for Southwest Airlines for over two years as an over-the-phone Reservations Agent.  She did not have any performance related issues during her time at Southwest Airlines.

13.     To enhance her skills in customer relationships with more in-person interaction, Adamson applied for a position at American.  Adamson was beyond ecstatic when American invited her for an interview.  She was convinced that American was a bigger and better airline with endless opportunities.

14.     Adamson joined American on September 23, 2014, and was assigned to OKC. OKC is a small airport with only three gates assigned to American.

15.     At the time Adamson joined American, the agents and supervisors at OKC were a tight-knit group and did things their own way.  Adamson's troubles at American started from the day she joined.  As a new hire, Adamson was required to attend training provided by American. During training, Adamson was given inconsistent information regarding her job assignments and never received the adequate training required to fulfill her job responsibilities.

16.     The senior agents at OKC opposed the idea of bringing new personnel into their close-knit group, especially people of color.  The senior agents refused to help, assist, or engage with the newly-hired agents of African American descent.

**PLAINTIFF'S COMPLAINT AND JURY DEMAND**                                    **Page 4**

17.     While on the job, Adamson heard negative comments made by senior Caucasian agents about the number of African Americans being hired by American. These agents would comment that American had hired too many African Americans.  There was a revolving door of African American agents being hired, fired, and transferred out.

**B.    Adamson's Discriminatory Write-ups And Suspension At OKC**

18.     Uncharacteristic of a place of employment that purports to foster inclusion and diversity, Adamson was reprimanded by the acting supervisors for conduct for which other Caucasian agents faced no consequences.

**2.     Adamson Was Consistently Forced To Stay Late, Irrespective Of The Fact She Had A Minor Child To Care For**

19.     Adamson was frequently forced to stay beyond her scheduled shifts, despite the fact that she had to care for and make arrangements for her two-year-old son.  For example, on November 28, 2015, Adamson was removed from the gates to work at the ticket counter and replaced with a less-senior Caucasian agent by the acting supervisor at the time, Suzanne Bray.  Bray also asked Adamson to stay late to cover a flight that was delayed for arrival to assist with the duties that she was originally assigned.

20.     Bray is a Caucasian woman that has been working for American for more than twenty years.  Once this flight was covered and serviced, there were sufficient agents to cover the remaining incoming flights.  Adamson requested Bray over-the-phone and in-person several times to be released to go home to tend to her minor child.  Bray ignored Adamson's requests and stormed off towards the operations room.  Adamson followed Bray to the operations room requesting to be released when Bray purposely attempted to shut Adamson out of the operations room and slammed the door on her foot.

21.     When Adamson expressed her concerns and frustration to Bray, she was written up.  Adamson filed a grievance against Bray and alerted human resources ("HR") that she did not feel comfortable working with Bray.  American took no action. Other African Americans agents at OKC were subjected to the same treatment.

**3.     Adamson's Baseless First Suspension**

22.     In January 2016, Adamson was again asked to stay past her shift without advanced warning.  During her break that day, she sat in a nearby wheelchair.  Adamson saw other agents do it as well without consequences.   Additionally, American has no policy prohibiting agents during their breaks from sitting in wheelchairs that are not in use.   A complaint was filed against Adamson for sitting in a wheelchair, and three weeks later, Alex Commacho ("Commacho"), the lead supervisor at the time, suspended Adamson for a week for this alleged infraction.

23.     This suspension effected Adamson's employee flight privileges which were also suspended.  Unfortunately, the day Adamson was placed on suspension, she was scheduled to pick up her two-year-old son in California. Therefore, instead of being able to use her employee flight privileges, Adamson was forced to leave her minor son in California for an extra week, until her flight privileges were reinstated.

24.     Commacho joined American from U.S. Airways as part of the merger. Astonishingly, Commacho advised Adamson that she should just leave OKC because her job would be in jeopardy if she planned to stay.  This is yet another example of how senior agents at American mistreated employees of color at OKC.

**C.**   **American Transfers Adamson Out Of OKC; American Purports To Investigate The Unfair Treatment Of African American Employees**

25.    Adamson was not the only African American agent treated unfairly at OKC. Other African American agents' jobs were also threatened by the discriminatory practices at OKC.  Some employees did file discrimination complaints with American.  The behavior and treatment at OKC became so egregious, that in 2016, American's HR sent two corporate investigators to OKC, namely, Sherry Bartell from American's headquarters in Dallas, Texas, and Ana Burke-Leon from American's HR Business Partners in Miami, Florida, to investigate.

26.    As part of her investigation, Bartell questioned all the African American employees assigned to OKC to determine whether they were being discriminated against.

27.    In May 2016, four African American agents, including Adamson, that had previously filed complaints relating to discriminatory treatment at OKC were transferred to other cities.  Three agents were transferred to airports in Miami, Florida, and Los Angeles, California, while Adamson was transferred to SAT.

28.    Also in May 2016, after Adamson was transferred to SAT, Burke-Leon conducted an investigation into the practices at OKC.  Burke-Leon contacted Adamson to discuss her experiences at OKC.  Adamson was never provided any information about the results of those investigations.  When Adamson followed up with Burke-Leon regarding the results of the investigations, Adamson was told that she could not receive information about those investigations.

**D.**   **American's Additional Discrimination Conduct**

29.    American's wrongful conduct is not only directed at its minority employees, but also at its minority customers.  After receipt of several appalling incident reports from African American passengers, in October 2017, the National Association for the Advancement of

Colored People ("NAACP") issued the following travel advisory warning for African Americans about their safety and well-being when traveling on American's flights:

> "The NAACP for several months now has been monitoring a pattern of disturbing incidents reported by African-American passengers, specific to American Airlines.  In light of these confrontations, we have today taken the action of issuing national advisory alerting travelers—especially African Americans—to exercise caution, in that booking and boarding flights on American Airlines could subject them disrespectful, discriminatory or unsafe conditions.  This travel advisory is in effect beginning today, October 24, 2017, until further notice.
>
> The series of recent incidents involve troublesome conduct by American Airlines and they suggest a corporate culture of racial insensitivity and possible racial bias on the part of American Airlines. . . .
>
> The NAACP deplores such alarming behavior on the part of airline personnel, and we are aware of these incidents only because the passengers involved knew their rights, knew to speak up and exercised the courage to do so promptly.  Historically, the NAACP has issued travel advisories when conditions on the ground pose a substantial risk of harm to black Americans, and we are concerned today that the examples cited herein may represent only the 'tip of the iceberg' when it comes to American Airlines' documented mistreatment of African-American customers."[3]

30.    Based on this prevalent and ongoing problem, American is overhauling its anti-discrimination training and implementing an annual implicit bias training for its employees as well as implementing a series of institutional changes.[4]

**E.    Adamson's Groundless Third Write-up**

31.    Adamson remained in SAT for seven months.  While there, Adamson discussed her employee file with her supervisor, Jimmy Dillard, who was also of African American descent.  The supervisor at SAT, after reviewing Adamson's file and the alleged baseless infractions contained therein, told Adamson that there was clearly a target on her back at OKC.

---

[3] *See* NAACP Issues National Travel Advisory for American Airlines, October 24, 2017, http://www.naacp.org/latest/naacp-issues-national-travel-advisory-american-airlines/, last visited March 29, 2018.

[4] *See* American's Commitment: Leading on Diversity, *Inclusion and Equality*, November 30, 2017, http://news.aa.com/press-releases/press-release-details/2017/Leading-on-Diversity-Inclusion-and-Equality/default.aspx, last visited March 29, 2018.

32.     Without initiating or requesting a transfer out of SAT, on November 7, 2016, Adamson received a transfer to DFW.  She had less that two days to decide whether she should take the position.   Adamson accepted the transfer because she not only had the opportunity to work full-time, but she also had the opportunity to be closer to her family in Oklahoma.

33.     Adamson was transferred twice during her employment with American that lasted less than two years and five months.  American employees typically must wait one year at a single location before they are eligible for a transfer.  In Adamson's case, however, after transferring from OKC to SAT, American transferred Adamson to DFW within seven months of working at SAT.

34.     At DFW, Adamson was required to complete a mandatory online Occupational Safety and Health Administration ("OSHA") training course by December 16, 2016.   On December 2, 2016, Adamson attempted to complete the training but American's system had technical difficulties.  She also participated in a week-long training session concerning DFW's complex operational systems.   Due to a shortage of American employees at DFW, upper management decided to pull Adamson and the other trainees out of training early to assist at the terminals.  Because of her busy work schedule and settling into a new city, Adamson completed her OSHA training one week after the purported deadline.

35.     Two-weeks after completing her training, on January 13, 2017, Adamson was written up for allegedly not completing her training on-time.  Adamson's appeal of this baseless charge was denied.

**F.     Adamson's Adherence To American's and FAA's Policies And Procedures**

36.     On January 28, 2017, Adamson and two other agents were stationed at Terminal C, Gate 12, at DFW, to assist passengers to board a flight leaving for OKC.  One passenger (the

"Passenger") tried to board the flight to OKC with four personal carry-on items, exceeding the Federal Aviation Administration ("FAA") allowance.  Adamson, fully aware that this was against FAA rules and regulations, especially on a full flight, she and another agent, Oteka Gundy, informed the Passenger that she would have to consolidate her items and/or check the carry-on items into baggage claim free of charge.  The Passenger refused.

37.     Adamson informed the Passenger that FAA rules only permit two carry-on items. The Passenger refused to consolidate her bags and argued that she was not required to do so on her previous flight.

38.     Based on FAA rules and regulations, the Passenger was forced to check one of her carry-on items, but another customer service agent, unbeknownst to Gundy and Adamson, broke protocol and allowed the passenger to board with three carry-on items on a full flight from DFW to OKC.

39.     Approximately a week later, the Passenger filed a complaint with American asking that Adamson be terminated or demanding an apology.  On February 12, 2017, two days before her vacation, Adamson was asked about the January 28th incident by her superiors, and was suspended on that day pending further investigation by American of this incident.

40.     On February 17, 2017, Adamson was terminated based on that incident and past alleged infractions that were baseless.  Adamson was never given the opportunity to apologize to the Passenger, nor was she even aware that the Passenger sought an apology.

41.     Adamson was never given the opportunity to review the allegations made against her by the Passenger until April 6, 2017, forty-eight days after her termination.

**G.**   **Damage Done**

42.   Because of American's unfair and discriminatory conduct and practices, Adamson has suffered injuries.  She has been left without work for months despite diligently looking for employment.  On the slight chance that Adamson is called for an interview, she is always asked about her termination from American.  Adamson has also interviewed for airline positions in other cities such as Houston, Texas, but without success.

43.   This incident has caused Adamson severe emotional distress and anxiety.  She is constantly stressed about her ability to financially support herself.  Adamson has been forced to stay in Dallas to bring this case instead of caring for her father, who is on hospice care in Oklahoma.  Adamson also had to send her son to California to be with his grandparents because she is unable to financially support him.  This incident has turned her life upside down and continues to haunt her daily.

44.   Over the past year Adamson has gone through the administrative process of filing a grievance with the United States Equal Employment Opportunity Commission and securing counsel to right the wrong done to her and prevent others from suffering similar treatment.  Adamson files this lawsuit to recover compensation for her damages and to ensure that others are not subjected to the same treatment.

**H.**   **Adamson Has Exhausted Her Administrative Remedies**

45.   Adamson filed her Charge of Discrimination with the Dallas District office of the Equal Employment Opportunity Commission ("EEOC") against American alleging discrimination.

46.   On January 4, 2018, the EEOC issued a Notice of Suit Rights.  A copy of the Notice is attached as Exhibit 1.

## CLAIMS

**A.** **Count One:  Discrimination Under Title VII Of The Civil Rights Act Of 1964, 42 U.S.C. § 2000e *et seq.***

47.     Plaintiff repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

48.     Defendant has violated Title VII of the Civil Rights Act of 1964 by discriminating and retaliating against Plaintiff based on race.

49.     As a direct and proximate result of Defendant's wrongful conduct, Plaintiff has suffered, and continues to suffer, substantial harm for which she seeks to recover monetary damages and equitable relief in an amount to be determined by the trier of fact, including, but not limited to, back pay, front pay, general and special damages for lost compensation, job benefits she would have received but for Defendant's discriminatory practices, and for emotional distress, humiliation, embarrassment, and mental anguish.

50.     Plaintiff is also entitled to an order reinstating her to her previous position, or at substantially similar position, and restoring all seniority rights and benefits, or in the alternative, an award for future lost wages and benefits.

**B.** **Count Two:  Harassment Under Title VII Of The Civil Rights Act Of 1964, 42 U.S.C. § 2000e *et seq.***

51.     Plaintiff repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

52.     Defendant violated Title VII of the Civil Rights Act of 1964 by failing to provide a workplace that is free of harassment based on race.

53.     Defendant violated Title VII of the Civil Rights Act of 1964 when Plaintiff was constantly harassed by the supervisors at OKC based on her race and when she received unwarranted write-ups and suspensions based on her race.

54.     Defendant's conduct had the purpose and effect of unreasonably interfering with Plaintiff's work performance and created an intimidating, hostile, and offensive working environment.

55.     Plaintiff's supervisors' harassment of Plaintiff was severe and pervasive. The workplace harassment included abusive statements and unfair treatment.  Further, Defendant was notified of the discriminatory conduct towards African American agents at OKC, yet refused to address the issue and ensure that its supervisors received the proper training.

56.     Defendant is strictly liable for the actions of its supervisors.

57.     As a proximate result of Defendant's discriminatory actions, Plaintiff suffered the loss of wages, salary, benefits, and additional damages in an amount to be proven at trial.

**C.     Count Three:  Discrimination Under Chapter 21 of the Texas Labor Code**

58.     Plaintiff repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

59.     Defendant violated Chapter 21 of the Texas Labor Code by discriminating and retaliating against Plaintiff based on race.

60.     As a direct and proximate result of Defendant's wrongful conduct, Plaintiff has suffered, and continues to suffer, substantial harm for which she seeks to recover monetary damages and equitable relief in an amount to be determined by the trier of fact, including, but not limited to, back pay, front pay, general and special damages for lost compensation, job benefits

she would have received but for Defendant's discriminatory practices, and for emotional distress, humiliation, embarrassment, and mental anguish.

61.     Plaintiff is also entitled to an order reinstating her to her previous position, or at substantially similar position, and restoring all seniority rights and benefits, or in the alternative, an award for future lost wages and benefits.

**D.     Count Four:  Intentional Infliction of Emotional Distress**

62.     Plaintiff repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

63.     Defendant intentionally caused Plaintiff severe emotional distress by discriminating against her, consistently writing her up for alleged baseless infractions, and ultimately causing her to be terminated for adhering to Defendant's and FAA's rules and regulations.

64.     Defendant's conduct was extreme and outrageous.

65.     As a direct and proximate result of Defendant's conduct, Plaintiff has suffered substantial injuries, including severe emotional distress.

66.     As a result, Plaintiff seeks actual and exemplary damages in an amount to be determined by the trier of fact.

**E.     Count Five:  Negligence**

67.     Plaintiff repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

68.     As Plaintiff's employer, Defendant owed Plaintiff a duty to provide a place of employment free from discrimination, harassment, and unfair treatment.

69.     Defendant negligently failed to supervise, manage, train, monitor, or oversee management to ensure that all employees are treated equally.

70.     Defendant negligently failed to ensure that Plaintiff was not terminated for adherence to American's and FAA's rules and regulations.

71.     Defendant negligently failed to adequately investigate all charges of discrimination at the OKC airport and report the findings and conclusions of any investigations to Plaintiff.

72.     As a direct and proximate result of Defendant's acts and/or omissions as set forth above, it was foreseeable to a person of ordinary prudence that Plaintiff would be exposed to discrimination, harassment, unfair treatment, and a baseless termination, such that Defendant's acts and/or omissions are the proximate cause of Plaintiff's damages in an amount to be proven at trial.

**F.      Count Six:  Attorneys' Fees**

73.     Plaintiff repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

74.     As a result of Defendant's conduct, Plaintiff has been forced to retain counsel to prosecute this action on her behalf.  Plaintiff has incurred, and will incur, additional attorneys' fees and costs in connection with this action.

75.     Pursuant to 42 U.S.C. §§ 1988 and 2000e-5(k), Plaintiff seeks an award of all reasonable and necessary attorneys' fees and costs.

**V.**

**JURY DEMAND**

76.     Plaintiff hereby demands a jury trial on all such triable issues.

**VI.**

**REQUEST FOR RELIEF**

77.    Plaintiff respectfully requests that Defendant be cited to appear and answer herein, and that upon final determination of her claims, the Court enters a final judgment for Plaintiff and against Defendant, awarding Plaintiff the following relief:

(a)    Actual, compensatory, consequential, exemplary, and punitive damages, in an amount to be determined by the trier of fact;

(b)    Reasonable and necessary attorneys' fees;

(c)    Costs of Court;

(d)    Prejudgment interest at the highest rates allowed by law from the earliest time allowed by law;

(e)    Interest on a final judgment at the highest legal rates from the date of judgment until collected; and

(f)    All such other and further relief at law and in equity to which Plaintiff may be justly entitled.

DATED:      April 4, 2018.                    Respectfully submitted,

                                              **BREWER STOREFRONT, PLLC**

                                              By: _____
                                                   William A. Brewer III
                                                   State Bar Number: 02967035
                                                   wab@brewerattorneys.com
                                                   Aamer Ravji
                                                   State Bar Number: 00798455
                                                   arr@brewerattorneys.com
                                                   LaCrecia Perkins
                                                   State Bar Number:24091574
                                                   llp@brewerattorneys.com
                                                   1717 Main Street
                                                   Suite 5900
                                                   Dallas, Texas 75201
                                                   Telephone: (214) 653-4000
                                                   Facsimile: (214) 653-1015

                                              **ATTORNEYS FOR PLAINTIFF**

4829-4055-1263.7
8001-01